# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 23-941V

|  |  |
|---|---|
| L.B.,<br><br>                 Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                 Respondent. | Chief Special Master Corcoran<br><br>Filed: April 30, 2025 |

*Elizabeth Kyla Abramson, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On June 23, 2023, L.B. filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table claim – that she suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on December 4, 2020. *Id.* The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

A disputed fact issue has arisen regarding whether Petitioner's injury meets the Act's severity requirement. For the reasons discussed below, I find it more likely than not that Petitioner can establish this claim element.

---

[1] When this Ruling was originally filed, I advised Petitioner of my intent to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This Ruling is being posted with the granted redactions. Except for those changes and this footnote, no other substantive changes have been made. This Ruling will be posted on the court's website with no further opportunity to move for redaction.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.       Relevant Procedural History

In June 2024, Respondent stated he had completed the medical review of this matter and would defend the claim. ECF No. 28. Respondent thereafter filed a Rule 4(c) Report (ECF No. 32), contending that while Petitioner meets the criteria for a Table SIRVA, she has not established that she suffered her alleged SIRVA for more than six months post-vaccination. *Id*. at 8. The record shows that Petitioner last received treatment for her left shoulder approximately four and a half months post vaccination (in April 2021), and her last contact with her treater regarding her injury was in May 2021. *Id.* (citing Ex. 3 at 5-6, 32; Ex. 5 at 6-7; Ex. 6 at 384, 406-08). Petitioner then had a 17-month gap in care during which she reported numerous other medical issues but no shoulder symptoms. *Id*. at 9 (citing Ex. 9 at 22-26, 33-36, 52-61, 75-76, 87-94).

Petitioner thereafter filed medical literature exhibits in support of her ability to satisfy the six-month severity requirement, along with a "summary of submitted evidence" addressing this issue. ECF No. 34; ECF No. 35 at 2-6. Despite such newly filed evidence, Respondent expressed his intention to continue defending this matter on severity grounds. ECF No. 36. The issue of severity is thus ripe for consideration.

## II.       Relevant Authority

Pursuant to Section 13(a)(1)(A) of the Vaccine Act, a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed, or varied, by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III.    Finding of Fact Regarding Severity

I make this finding after a complete review of the record to include all medical records, affidavits, and additional evidence filed, and in particular the following:[3]

- Petitioner received the flu vaccine in her left deltoid on December 4, 2020. Exs. 12, 13.

- On February 2, 2021 (60 days post vaccination), Petitioner had a telemedicine visit with a nurse practitioner for left shoulder pain. Ex. 2 at 51-52. She reported that she received "the flu shot on Dec. [sic] 4th in the left shoulder" and "[h]as been having pain and trouble with range of motion [("ROM")] ever since." *Id.* at 52. She noted it had been almost two months of pain. *Id.* The treater recommended Petitioner appear for an in-person treatment visit. *Id.* at 54.

- That same day, Petitioner saw another nurse practitioner, and again reported that she had received a "flu vaccine 12/4" and "immediately post-vaccine she felt intense upper arm/shoulder pain" that has not subsided. Ex. 2 at 58. Petitioner described limited ROM, stiffness, soreness/aching, and rated her pain at a 5-10/10 (exacerbated by movement). *Id.* She noted that heat/ice, compression, and NSAIDs had not provided relief. *Id.* An examination showed mild inflammation, tenderness, and limited ROM of the left shoulder. *Id.* at 60. Petitioner was referred to an orthopedist and for an x-ray (which was normal). *Id.*; Ex. 7 at 8.

- Petitioner visited an orthopedist on February 10, 2021, stating that she received the flu shot "about 2 months ago" and her left shoulder has been "giving her a bit of a frozen shoulder." Ex. 5 at 6. An examination revealed full ROM, pain with movement, and full strength. *Id.* The orthopedist assessed Petitioner with "left shoulder adhesive capsulitis after her flu shot." *Id.* Petitioner received a steroid injection in the left shoulder. *Id.*

- The next day, Petitioner called her orthopedist reporting that her left shoulder initially "felt good" following her steroid injection but she then had a "lot of pain and stiffness" to the point that she could not sleep. Ex. 5 at 5. The orthopedist reassured her this was normal. *Id.*

---

[3] While I have reviewed all the evidence filed to-date in this case, only evidence related to severity will be discussed herein, though other facts may be provided as necessary.

- On March 15, 2021, Petitioner had a telemedicine visit with her primary care provider ("PCP") and noted her history of "SIRVA/frozen shoulder due to flu shot on 12/4/20." Ex. 6 at 382. Petitioner reported that her left arm was "totally stiff" with pain the day after she received her steroid injection, but she then experienced "some improvement." *Id.* However, she again was experiencing soreness, "more pain[,] and stiffness[,]" that impacted her ability to sleep. *Id.* The PCP assessed Petitioner with adhesive capsulitis "s/p shoulder steroid injection with minimal improvement." *Id.* at 384. The PCP referred Petitioner to physical therapy ("PT"), and told her that "she does have a long course of PT ahead of her to resolve this pain." *Id.*

- In a message to her PCP on March 17, 2021 (seemingly in connection with her ability to work), Petitioner described shoulder stiffness that impacts her ability to perform activities of daily living ("ADLs"), including with sleeping, washing her hair and dishes, and with typing at work. Ex. 6 at 389. She wrote that she was "concerned about the long-term, intensive recovery this will take" to improve her symptoms. *Id.* She described her pain as "always an ache" with a pinching and burning sensation. *Id.* Petitioner stated she "can feel the sensation of 'frozen' tissue." *Id.*

- Petitioner had an initial PT evaluation on April 14, 2021, and complained of shoulder pain that started on "Dec. 4, 2020 SIRVA." Ex. 3 at 2. Petitioner reported that a steroid injection had "provided some relief." *Id.* She also noted that her pain "feels episodic, linked to inflammation," and that she "tries baths with Epsom salts, [and] wrapping [her] arm" but still has pain and tightness in the left shoulder into the neck. *Id.* Petitioner's goals included to "wash [her] hair without it hurting, return to kayaking, [and] do [the] dishes." *Id.* She rated her current pain at a 7/10. *Id.* Petitioner exhibited limited ROM, guarding, and stiffness upon examination but the "[e]xam findings [were] limited due to [Petitioner's] anxiety surrounding medical treatment." *Id.* at 3. The treater recommended eight weeks of PT (through mid-June 2021) and noted that Petitioner had "a negative experience with [PT] in the past which may impact [her] progress[.]" *Id.* at 3-4.

- During Petitioner's second PT visit on April 20, 2021, she reported "some relief" after her last session. Ex. 3 at 5. Petitioner exhibited diminished active ROM in the left shoulder compared to the right, plus pain with extension. *Id.* The treater's assessment noted that Petitioner had a "good initial response to PT but did have a lot of difficulty with scapular motor control. She had some tenderness with manual therapy, but did get some relief after." *Id.* at

6. The treater also noted that "internal rotation flared up the shoulder even after [the treater and Petitioner] tried adjusting form, so we ended [the] session[.]" *Id.* Petitioner did not return for additional shoulder treatment thereafter.

- On May 9, 2021, Petitioner emailed her PCP inquiring about receiving the COVID-19 vaccine in her thigh instead of "into [her] flu-shot damaged left shoulder." Ex. 6 at 407.

- Petitioner was discharged from PT on May 26, 2021, after attending only two sessions. Ex. 3 at 32. The record of discharge states that it occurred at Petitioner's request, as "she has other medical concerns that she would like to take priority at this time." *Id.*

- Petitioner thereafter attended several appointments for unrelated ailments over a lengthy period of time, but she did not report left shoulder symptoms at any of these visits. *See,* e.g., Ex. 6 at 416-21 (a July 5, 2021 emergency care visit for a bladder infection); Ex. 6 at 432-38, 454-55 (a December 5, 2021 urgent care visit for facial cellulitis); Ex. 9 at 22-26 (a June 24, 2022 telemedicine "chat" with a physicians' assistant for a concern regarding exposure to scabies); Ex. 9 at 33-36 (a June 28, 2022 message to her PCP regarding skin concerns and several other systemic symptoms); Ex. 9 at 52-61, 65-66 (July 11, 2022 PCP and dermatology visits for skin concerns); Ex. 9 at 75-82 (an August 2, 2022 infectious disease telemedicine visit); Ex. 9 at 87-101 (a September 26, 2022 gynecology visit and uterine biopsy).

- The next record of any shoulder complaints relating to the alleged SIRVA comes from October 25, 2022 - over 17 months since her last visit for left shoulder pain. At this time, Petitioner sent a message to her PCP stating that she has "learned to adapt and adjust to compensate for the [SIRVA] but there are times, especially during colder weather, [she] experience[s] increased stiffness and pinching." Ex. 9 at 106. She described difficulties with vacuuming, changing bedding, hair washing, sleeping, and kayaking. *Id.* Another physician in her PCP's office responded noting "it sounds like [Petitioner's] injury was almost 2 years ago" so the treater felt she needed "to consider that other possible causes, like a rotator cuff strain, maybe playing a role." *Id.* The physician recommended an office visit. *Id.* Petitioner did not seek any additional shoulder-related care thereafter.

- In her declaration, authored on October 13, 2023, Petitioner generally attests that she "sustained injuries that lasted beyond 6 months after administration of the vaccine." Ex. 11 ¶ 3. According to Petitioner, "[m]ost treatment for [her] shoulder was self-administered because [she has] a very problematic relationship with the medical field following several traumatic incidents throughout [her] life[.]" *Id.* ¶ 4. She therefore experienced "intense anxiety" when she visits doctors. *Id.* She attested to ongoing "twinges" in her left shoulder, and that she has not returned to kayaking. *Id.* ¶ 5.

- While not a contemporaneous medical record or witness declaration, as noted above, counsel for Petitioner filed a status report containing a "summary of submitted evidence" regarding severity. ECF No. 35. In it, counsel stated that "[s]ince the initiation of Petitioner's claim, [she] was diagnosed with breast cancer and has been undergoing aggressive cancer therapy." *Id.* at 2. Counsel did not cite to medical records to corroborate this allegation, however, or provide a timeline of this treatment with more specificity.

## ANALYSIS

The Vaccine Act requires that a Petitioner demonstrate that "residual effects or complications" of a vaccine related injury continued for more than six months. Vaccine Act § 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. § 13(a)(1)(A). To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.*

Additionally, "the fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Hum. Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Hum. Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care and thus that "a discharge from medical care does not necessarily indicate there are no residual effects"). In another SPU case, where a petitioner's last treatment was at five months and nine days, the petitioner was found to meet the six-month

requirement. *Schafer v. Sec'y of Health & Hum. Servs.*, No. 16-0593V, 2019 WL 5849524 (Fed. Cl. Spec. Mstr. Aug. 28, 2019). In that case, based on the petitioner's symptomology and progression, the special master noted that it was unlikely "that petitioner's shoulder symptoms would have resolved within [the next] 22 days." *Id*. at *7.

In this case, there appears to be no dispute that Petitioner received the flu vaccine on December 4, 2020, and that the onset of her post-vaccination shoulder symptoms occurred within 48 hours of the subject vaccination. ECF No. 32 at 8. She therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from onset, or through June 4, 2021. *See,* e.g., *Herren,* 2014 WL 3889070, at *3.

The records discussed above establish that on April 20, 2021 (merely 45 days shy of the severity "cut-off"), Petitioner exhibited diminished active ROM in the left shoulder compared to the right, difficulty with scapular motor control, tenderness with manual therapy, and a flare up of pain with internal rotation to the point that Petitioner's physical therapist had to end the session. Ex. 3 at 5-6. More so, just six days prior to this visit (at her first PT visit on April 14th), Petitioner rated her pain at a 7/10. *Id.* at 2. Accordingly, additional PT was recommended to address these ongoing symptoms, for eight weeks or through *mid-June* 2021 (at the earliest). *Id.* at 3-4.

These record notations, paired with a proposed continued treatment course, provide evidence that Petitioner's injury was at this point likely ongoing, and that her treating physician did not predict that the injury was likely to resolve soon thereafter – or even within the next month and a half. *See,* e.g., *Schafer*, 2019 WL 5849524, at *7.

I also do not construe Petitioner's cessation of treatment after April 2021 as evidence that her injury had resolved by that time. Rather, Petitioner's treatment cessation has a reasonable explanation (that she had anxiety around medical encounters and also wanted to focus on other medical concerns at that time). *See* Ex. 3 at 3-4 (an April 14, 2021 PT note that Petitioner had "a negative experience with [PT] in the past which may impact [her] progress[.]"); Ex. 3 at 32 (a May 26, 2021 discharge note that Petitioner wanted to discontinue PT to make other medical concerns a "priority"); *see also* Ex. 11 ¶ 4 (stating she has a "very problematic relationship with the medical field following several traumatic incidents" and experienced "intense anxiety" when she visits doctors; thus most of her treatment was self-performed). While Petitioner did obtain treatment during the subsequent lengthy gap for non-shoulder related issues, I do not conclude from this that her alleged SIRVA had likely resolved fully by early June.

Compared to other SIRVA injuries, however, Petitioner's left shoulder pain and limited ROM was not especially severe, even at the time she did obtain treatment. And

significantly, she did not seek follow up care after April 2021 for more than a year and a half. All of this speaks to the obvious mildness of Petitioner's symptoms[4] – but that is a matter that goes to the ultimate quantum of damages to be paid, rather than whether the claim's temporal severity has been established.

### IV.    Scheduling Order

Respondent shall file, by no later than <u>Friday, May 30, 2025</u>, a status report concerning how he intends to proceed, including, if appropriate, whether he would like to file an amended Rule 4(c) report.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[4] For this reason, Petitioner should not expect to receive any damages for treatment obtained after the lengthy gap, and should also anticipate a very modest pain and suffering award.